**Cynthia BOONE, Individually and as Next Friend of Ashley Boone, Plaintiff,**

v.

**Fay BOOZMAN, Director of the Arkansas Department of Health, in his Official Capacity; John Doe 1 through John Doe 20, in their Official Capacities as Agents, Servants, Employees or Officials of the State of Arkansas, Department of Health; and Cabot School District, Defendants.**

**No. 4:01CV006585 SWW.**

United States District Court, E.D. Arkansas, Western Division.

Aug. 12, 2002.

Gregory T. Karber, Pryor, Robertson & Barry, PLLC, Fort Smith, AR, Robert T. Moxley, Gage & Moxley, Cheyenne, WY, for Plaintiff.

Robert Michael Brech, Arkansas Dept. of Health, Little Rock, AR, for Arkansas Dept. of Health and Fay Boozman.

William Clay Brazil, Brazil, Adlong & Winningham, Conway, AR, for Cabot School District.

## MEMORANDUM OPINION AND ORDER

SUSAN WEBBER WRIGHT, Chief Judge.

Section 6–18–702 of the Arkansas Code Annotated requires that children be immunized from certain diseases before they may attend public or private school in the State of Arkansas. In enacting subsection (d) of that statute, the General Assembly conferred a religious exemption from the immunization requirements on individuals for whom "immunization conflicts with the religious tenets and practices of a recognized church or religious denomination of which [they are] an adherent or member." Plaintiff Cynthia Boone, on behalf of her daughter Ashley Boone, filed this 42 U.S.C. § 1983 action challenging the constitutionality of the immunization statute after her daughter was suspended from school because she had not received the required Hepatitis B immunization.[1]

Now before the Court is separate defendant Fay Boozman's motion for summary judgment [docket no. 47], separate defendant Cabot School District's adoption of that motion [docket no. 50], and plaintiff's response in opposition [docket no. 51]. Also before the Court are plaintiff's motions for summary judgment under the Fourteenth Amendment [docket no. 53] and First Amendment [docket no. 56] to the United States Constitution, separate defendant Fay Boozman's responses in opposition [docket nos. 59, 63], and separate defendant Cabot School District's response [docket no. 65]. After careful consideration, and for the reasons stated below, the Court determines that defendant's motion for summary judgment must be granted in part and denied in part, plaintiff's motion for summary judgment under the Fourteenth Amendment must be denied, and plaintiff's motion for summary judgment under the First Amendment must be granted in part and denied in part.

## I. Background

Unless otherwise attributed, the following undisputed facts are taken directly

---

1. Two other cases were filed in federal court challenging the constitutionality of the immunization statute: *Brock v. Boozman*, No. 4:01CV00760 SWW, 2002 WL 1972086, in the Eastern District of Arkansas, and *McCarthy v. Boozman*, 212 F.Supp.2d 945 (W.D.Ark.2002), in the Western District of Arkansas. On July 25, 2002, United States District Judge Robert T. Dawson of the Western District of Arkansas filed a Memorandum Opinion and Order in the *McCarthy* case declaring the religious exemption to the immunization statute unconstitutional. Although different facts and arguments presented in this case have dictated the analysis to be followed in this case, to the extent the legal analysis and conclusions present in Judge Dawson's Memorandum Opinion and Order are applicable to this case, the Court adopts them fully.

from the parties' statements of undisputed facts [docket nos. 49, 55, 58, 61, 64].[2]

Section 6–18–702(a) of the Arkansas Code Annotated provides that no child shall be admitted to school without proof of immunization from certain diseases.[3] The Arkansas Department of Health is charged by Arkansas statute and federal regulations with auditing the immunization status of Arkansas school children which includes notifying schools and/or citizens of any lack of "full immunization" status. Hepatitis B has been designated as one of those diseases from which school children must be immunized.[4] As a transfer student, Ashley Boone was required to submit proof that she had received the Hepatitis B vaccine. Cynthia Boone brought the present action after the Cabot School District, on or about October 1, 2001, in-

formed her that her daughter, Ashley Boone, could no longer attend Cabot Senior High School because she did not have a Hepatitis B vaccination.[5]

Cynthia Boone sincerely objects to the administration of Hepatitis B vaccine to her daughter for religious reasons and on conscientious grounds which include traditional parenting concerns. The immunization statute does provide a religious exemption; however, the General Assembly limited the exemption as follows:

> The provisions of this section shall not apply if the parents or legal guardian of that child object thereto on the grounds that immunization conflicts with the religious tenets and practices of a *recognized church or religious denomination* of which the parent or guardian is an adherent or member.

Ark.Code Ann. § 6–18–702(d)(2) (Repl. 1999) (emphasis supplied).[6]

---

**2.** Plaintiff did not file a separate statement of disputed facts in response to separate defendant Fay Boozman's statement of undisputed material facts [docket no. 49], and those facts are thus deemed admitted. *See* Local Rule 56.1(b) & (c). Additionally, in her brief in response [docket no. 52] to Boozman's motion for summary judgment [docket no. 48], plaintiff indicates agreement with the facts as stated by Boozman; the Court thus considers those facts undisputed and includes them in the above rendition.

**3.** The immunization statute states: "Except as otherwise provided by law, no infant or child shall be admitted to a public or private school or child care facility of this state who has not been age appropriately immunized from poliomyelitis, diphtheria, tetanus, pertussis, red (rubeola) measles, rubella, and other diseases as designated by the State Board of Health, as evidenced by a certificate of a licensed physician or a public health department acknowledging the immunization." ArkCode Ann. § 6–18–702(a) (Repl.1999).

**4.** Specifically, the Rules and Regulations promulgated July 27, 2000 by the Arkansas Department of Health pursuant to the immunization statute provide the following: "The requirements[ ] for entry into school, irrespective of grade, are at least three doses of Acellular Diphtheria/Tetanus/Pertussis (DtaP),

Diptheria/Tetanus/Pertussis (DTP), Diphtheria/Tetanus (DT pediatric), or Tetanus/Diphtheria (Td Adult), at least three doses of polio vaccine; two doses of Rubeola (measles) vaccine, one dose of Rubella (German measles) vaccine and one dose of Mumps vaccine. Additionally, three doses of Hepatitis B vaccine and one dose of Varicella (chickenpox) vaccine are required before entering Kindergarten. Three doses of Hepatitis B are required for Transfer students (students not in your school district last school year) and students entering the seventh grade." *See* docket no. 56, health department exhibit 8.

**5.** On October 15, 2001, after holding a hearing on plaintiff's motion for preliminary injunction, the Court entered an Order [docket no. 13] enjoining defendants from preventing Ashley Boone from attending school because she had not received a Hepatitis B vaccination. The injunction was effective until the end of the school semester in December, 2001, and by Order entered December 14, 2001 [docket no. 30], was extended until the conclusion of the 2001–2002 school year.

**6.** The immunization statute also provides for a medical exemption, for which Ashley Boone does not qualify. Ark.Code Ann. § 6–18–702(d)(1) & (3). Plaintiff does not argue that

The Department of Health employs persons who, pursuant to the immunization statute and under defendant Fay Boozman's direction, "screen" religious exemption applications to determine whether the applicants satisfy the "recognized religion" requirement, and if so, whether the "tenets and practices" of said religion "conflict" with the immunization program. Overall, the percentage of school age children in Arkansas whose parents seek religious exemption is only a small fraction of one percent of the total school age population. Although Cynthia Boone has never formally filed the application for a religious exemption, the Department of Health has evaluated Cynthia Boone's claim to exemption and determined that, because Cynthia Boone is not a member of a recognized religion with tenets against vaccination, she is not eligible for the religious exemption.[7]

Accordingly, the Cabot Schools, which Ashley attends, have been directed not to "admit" Ashley to school until she is "age appropriately immunized" with the recommended immunizations, including the Hepatitis B vaccination.[8] No evidence exists to show that Ashley Boone is at significant risk for contracting Hepatitis B, and Ashley Boone is of the age where, even if she were to contract Hepatitis B, she would have a 90% likelihood of full recovery.

There is no evidence that even a single case of Hepatitis B is present in the schools of Cabot, Arkansas, and there is no declaration of public health emergency in Arkansas with regard to Hepatitis B.

Although there is no evidence that any prosecution has been threatened in this case, the Court notes that immunization statute carries with it a criminal penalty for non-compliance. Ark.Code Ann. § 6–18–702(e).

## II. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89

the medical exemption to the immunization requirement constitutes the type of secular "individualized exemption" which might trigger strict scrutiny of a refusal to make religious exemptions. *See, e.g., Fraternal Order of Police v. Newark*, 170 F.3d 359, 364–66 (3rd Cir.1999) (Police department's decision to provide medical exemptions to its no-beard requirement, while refusing religious exemptions to the no-beard requirement, was subject to strict scrutiny and violated Free Exercise Clause.).

7. *See* docket no. 56, plaintiff exhibits C & D. Cynthia Boone claims no affiliation with any particular church, although she states she attends Methodist church or occasionally Lu-

theran church, and was baptized Lutheran. *See id.*, exhibit A (transcript), page 52. Cynthia Boone discussed her concerns about immunization with a Methodist minister who advised her that immunizations were not against the tenets of the Methodist faith. *See* docket no. 2, exhibit B. Cynthia Boone's religious convictions are further described in the "Discussion" section of this Order, *infra*.

8. Separate defendant Fay Boozman both admits and denies this fact. *See* docket no. 55, paragraph 7; docket no. 64, paragraph 7; docket no. 58, paragraph 9; docket no. 61, paragraph 9. The necessity of the Court's injunction permitting Ashley Boone to attend school suggests that this fact is true.

L.Ed.2d 538 (1986). The non-moving party may not rest on mere allegations or denials of his pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir.1995). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citations omitted). Further, summary judgment is particularly appropriate where an unresolved issue is primarily legal, rather than factual. *Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1326 (8th Cir. 1995).

### III. Discussion

Defendant Fay Boozman, joined by defendant Cabot School District, seeks summary judgment asserting: (1) compulsory immunization laws are constitutional; (2) Arkansas's statutory religious exemption is constitutional; and (3) Cynthia Boone, on behalf of Ashley Boone, is not entitled to a religious exemption from the immunization statute. Plaintiff Cynthia Boone, in turn, seeks summary judgment asserting the following arguments in various permutations: (1) the immunization statute lacks religious neutrality; (2) mandatory immunization would violate her religious beliefs, abridge her parental rights, and impinge upon her medical freedom and Ashley Boone's personal autonomy rights; (3) in-

dividuals with conscientious objection to immunization and who have not been prophylactically immunized may not be excluded from school in the absence of a clear and present danger to public health; and (4) the state's "police power" to immunize does not outweigh a parent's fundamental right to informed consent to medical procedures performed on a child. Because the parties' arguments overlap, the Court will address them by substantive category.

### A. Sincerely Held Religious Beliefs

■■ A belief must be rooted in religion to be protected by the religion clauses of the First Amendment. *Thomas v. Review Board,* 450 U.S. 707, 713, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981). However, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.* at 714, 101 S.Ct. at 1430. The Court's review of Cynthia Boone's belief about immunization is therefore restricted to considering whether the belief is religious in nature and sincerely held.[9]

In an affidavit filed at the inception of this case, Cynthia Boone explained that although she was not a member of any church, she was a deeply religious person and felt strongly that Ashley Boone should not have to "defile" her body by injecting it with the Hepatitis B vaccine.[10] She stated that her beliefs came from revelations she received on a regular basis from God, and what she perceived to be her personal relationship with God.[11] In her testimony at the preliminary injunction hearing, Cynthia Boone indicated that her

---

9. Defendants do not directly challenge Cynthia Boone's particular religious beliefs, but they do not affirmatively acquiesce to their sincerity or basis in religion, either.

10. *See* docket no. 2, exhibit B.

11. *See id.*

belief that immunization defiles the body was also based on her reading of the bible.[12] She explained that she prays to God, and that he speaks to her through angels.[13] An angel told her that she "needed to be very careful, as to what is going around in the world and to be very careful what [she does] to her children."[14] Because Cynthia Boone initially did not understand, and was afraid to accept, what her angel told her, her children were immunized earlier in their lives.[15] Cynthia Boone came to understand the angel's revelation about immunization over a period of years, and that revelation was cemented when Ashley Boone was faced with having to take the Hepatitis B vaccine.[16] Cynthia Boone further believes that vaccinations are "part of the devil's plan," and that vaccinating Ashley Boone against Hepatitis B, which can be transmitted by unprotected sex and intravenous drug use, supports the devil in his effort to encourage Ashley Boone to engage in unprotected sex and intravenous drug use.[17]

■ The Court finds that Cynthia Boone's belief concerning immunization, as divined from her reading of the bible and through God's revelations to her through angels, is rooted in religion and sincere. Although she has at times doubted the revelations and had some difficulty articulating her beliefs at the hearing, such difficulties do not alter this Court's opinion. Accordingly, the Court proceeds with its First Amendment analysis.

## B. Establishment Clause—Statutory Exemption

■ The Establishment Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, *see Everson v. Board of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 508, 91 L.Ed. 711 (1947), provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. The standard by which a court reviews the constitutionality of a statute under the Establishment Clause depends upon whether that statute facially discriminates among religious sects. *Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084, 1090 (8th Cir.2000). If the statute discriminates among religious sects, the court applies strict scrutiny review as prescribed by *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). *Id.* If the statute does not discriminate among religious sects, the court applies the less-stringent, familiar three-pronged test announced in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *Id. See also Corporation of the Presiding Bishop v. Amos*, 483 U.S. 327, 339, 107 S.Ct. 2862, 2870, 97 L.Ed.2d 273 (1987) ("*Larson* indicates that laws discriminating *among* religions are subject to strict scrutiny, and that laws affording a uniform benefit to *all* religions should be analyzed under *Lemon*.") (emphasis in original; internal quotation omitted).

Despite the facial discrimination between religions evinced in the statute, *see infra*, the parties in this case have argued the immunization statute's constitutionality under the Establishment Clause using the *Lemon* test.[18] In any event, the Court's

---

12. *See* docket no. 56, exhibit A (transcript), pages 51–52, 55–56, 60–61, 78.

13. *See id.*, pages 71–73.

14. *See id.*, page 73.

15. *See id.*, pages 73, 90–94. Cynthia Boone has four children total, who, at the time this lawsuit began, ranged in age from 12 to 23. *See id.*, page 49.

16. *See id.*, pages 74–75.

17. *See id.*, pages 97–98.

18. The *Larson* strict scrutiny standard is utilized when law facially differentiates among religious sects because "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at

application of the *Lemon* test at the parties behest will not disadvantage plaintiff, as plaintiff prevails even when the constitutionality of the immunization statute is evaluated under the less-stringent *Lemon* test.

To survive an Establishment Clause challenge under the *Lemon* test, a statute must: (1) have a secular legislative purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion. *See Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111; *cf. Zelman v. Simmons–Harris,* — U.S. ——, 122 S.Ct. 2460, 2465, 153 L.Ed.2d 604 (2002) (The Establishment Clause "prevents a State from enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion."). A challenged statute is valid only if it satisfies all three parts of the *Lemon* test. *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).

### 1. Secular Legislative Purpose

■ Defendant asserts that the religious exemption provided for in the immunization statute satisfies the first prong of the *Lemon* test, a secular legislative purpose, because it constitutes a "permissive accommodation." *See Children's Healthcare,* 212 F.3d at 1093 ("[T]he alleviation of a special, government-created burden on religious belief and practice constitutes a valid secular purpose under *Lemon.*"). The requirement that a law serve a secular legislative purpose does not mean that the law's purpose must be wholly unrelated to religion. *Amos,* 483 U.S. at 335, 107 S.Ct. at 2868. "Rather, *Lemon's* 'purpose' requirement aims at preventing the relevant governmental decisionmaker ... from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters. Under the *Lemon* analysis, it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.*

In *Children's Healthcare,* for example, the Eighth Circuit rejected an Establishment Clause challenge to a portion of the Medicare and Medicaid Acts drafted to permit individuals with religious objections to medical care to receive government assistance for care received at "religious nonmedical health care institutions." *Children's Healthcare,* 212 F.3d at 1089–91. The Eighth Circuit recognized that health care is a "widely available public benefit[ ] that [is] of great importance to personal well-being," and determined that the burden imposed by the Medicare and Medicaid Acts on those individuals who for religious reasons object to medical treatment was sufficient to warrant a permissive accommodation; Congress's effort at alleviating this burden reflected a valid secular purpose. 212 F.3d at 1094. The Eighth Circuit *also* found, however, that the exception at issue in *Children's Healthcare* was denominationally neutral. *Id.* at 1091. An individual could elect to receive Medicare- and Medicaid-funded services in a religious nonmedical health care institution

244, 246, 102 S.Ct. at 1683, 1684. In *Larson,* plaintiffs brought a First Amendment challenge to a Minnesota statute which restricted exemptions from the registration and reporting requirements of the Minnesota Charitable Solicitation Act to "those religious organizations that received more than half of their total contributions from members or affiliated organizations." *Id.* at 231–32, 102 S.Ct. at

1677. Because the Minnesota statute advantaged well-established churches with correspondingly strong financial support from their members over newly-established churches with potentially greater dependence on the public for financial support, the Court utilized strict scrutiny review, ultimately invalidating the statute. *Id.* at 246 n. 23, 102 S.Ct. at 1684 n. 23.

"by simply stating that he or she is 'conscientiously opposed' to medical treatment and that such treatment is 'inconsistent with his or her religious beliefs.' " *Id.* (quoting 42 U.S.C. § 1395i–5(b)(2)(A)). In fact, the portion of the statute at issue in *Children's Healthcare* was drafted with the goal of sect-neutrality in mind after a federal district court declared a predecessor provision unconstitutional as facially discriminating among religious sects. *Id.* at 1088–89.

Defendant asserts that the religious exemption in this case reflects a valid secular purpose because it alleviates the pressure imposed upon individuals with religious objections to immunization to become immunized so that they may attend school. In principle, this theory is correct; however the "permissive accommodation" theory cannot carry defendant past the first part of the *Lemon* test because the immunization statute on its face speaks in terms of "the religious tenets and practices of a recognized church or religious denomination." Ark.Code Ann. § 6–18–702(d)(2).

The statute singles out "recognized churches" for preferential treatment. The fact that the statute does not single out particular churches or denominations *by name* is of no consequence here. The Eighth Circuit has recognized that a law need not expressly distinguish between religions by sect name; rather discrimina-

tion can be evinced by objective factors such as the law's legislative history and its practical effect while in operation. *Children's Healthcare*, 212 F.3d at 1090. Further, personal religious beliefs are not a basis for an exemption under the immunization statute.[19] Yet the First Amendment's protections are not limited to those who are responding to the commands of a particular religious organization. *See, e.g., Frazee v. Illinois Dep't of Employment Sec.*, 489 U.S. 829, 830–34, 109 S.Ct. 1514, 1516–18, 103 L.Ed.2d 914 (1989) (the denial of unemployment compensation benefits to an individual who "as a Christian . . . could not work on the Lord's day" on the ground that his refusal to work was not based on the "tenet or dogma of an established religious sect" violates the Free Exercise Clause).

Under the statutory exemption and the Department of Health's corresponding review, it is not sufficient that an objection to immunization flows from an individual's interpretation of her church's tenets or her sincere, personal religious beliefs. The effect is to discriminate against a non-denominational, nonsectarian individual with a sincerely held individual religious belief, or churches and religious denominations that do not have explicit policies on immunization but may leave such matters to individual religious conscience.[20] Permissive accommodation, whatever its lim-

---

**19.** *See* docket no. 56, exhibit A (transcript), at page 34 (finding of the Court upon stipulation of the parties).

**20.** For example, adherents of particular religions or denominations known by the Department of Health to categorically oppose the practice of immunization, such as the Christian Science religion, are granted exemptions, while adherents of other religions or denominations, such as the Catholic faith, are denied exemptions based on their unofficial, personal interpretation of what their religion or faith requires. *See id.* at pages 18–20. Plaintiff gives the example of the Catholic who, in

keeping with the official dictates of the Catholic Church, opposes abortion, and takes that opposition a step beyond the official dictates of the Catholic Church, opposing the administration of a vaccine manufactured from a fetal cell line because of a belief that the acceptance of the vaccine would imply complicity with abortion. Likewise, plaintiff, who attends (but is not a member of) and adheres to some of the beliefs of the Methodist church, and who bases her objection to immunization on her personal reading of scripture and revelations from God, cannot obtain an exemption under the statute. *See id.*, plaintiff exhibits C & D.

its, still requires neutrality among religions. *Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 707, 114 S.Ct. 2481, 2493, 129 L.Ed.2d 546 (1994). *See also, e.g., Turner v. Liverpool Central Sch.*, 186 F.Supp.2d 187, 192 (N.D.N.Y.2002) (finding statutory exemption for those who "hold genuine and sincere religious beliefs" contrary to the practice of immunization sufficiently neutral to satisfy the secular purpose test).

### 2. *Primary Effect*

The second part of the *Lemon* test requires that the primary effect of the challenged portion of the statute be neither to advance nor inhibit religion. *See Lemon*, 403 U.S. at 612, 91 S.Ct. at 2111. Legislation does not violate the second part of the *Lemon* test simply because it provides special consideration to a religious group or better enables a religion to advance its cause. *Children's Healthcare*, 212 F.3d at 1095. Rather, "a religious accommodation impermissibly advances or inhibits religion only if it imposes a substantial burden on nonbeneficiaries, or provides a benefit to religious believers without providing a corresponding benefit to a large number of nonreligious groups or individuals." *Id.* (internal citations omitted).

Plaintiff's briefs do not directly address the burden/benefit aspect of the *Lemon* test, other than to state, in conclusory fashion, that the statutory exemption fails the second part of the *Lemon* test. Thus, this Court is left to its own devices to determine whether and how the statutory exemption imposes a substantial burden on those individuals who are *not* exempted from the immunization requirements as members or adherents of a recognized church or religious denomination with religious tenets and practices against vaccination, or confers a special benefit upon its beneficiaries—namely, members or adherents of a recognized church or religious denomination.

Defendant suggests that the only potential burden on non-beneficiaries is the increased health risk to those individuals who either have not been immunized due to medical contraindications or were immunized but did not gain the benefit of the vaccine, and that this burden is too minimal to violate the second part of the *Lemon* test. This may be true, where religious beliefs are excluded from consideration. It is possible, too, that nonbeneficiaries are "burdened" due to the State's expenditure of funds in maintaining the Religious Exemption Program. The Court finds troubling, however, that certain non-beneficiaries, namely individuals who oppose immunization on religious grounds but are not members of a religious organization that the State recognizes, are "burdened" by facing vaccination in contravention of their convictions, while other religious individuals belonging to certain churches recognized by the State are excused from vaccination and thus permitted to indulge their religious convictions.

In this sense, the "burden" derives from the statutory exemption's suggestion, whether facially or as applied, that the sovereign endorses or favors certain religious interpretations of a particular issue (here, the propriety of immunization) over others. *Cf. Clayton v. Place*, 884 F.2d 376 (8th Cir.1989) ("To the extent plaintiffs contend the rule impermissibly endorses or conveys a message of governmental preference for a particular religious viewpoint concerning social dancing, we find nothing in the rule ['School dances are not authorized and school premises shall not be used for purposes of conducting a dance'] to suggest the District has taken a position on questions of religious belief or made adherence to religion relevant in any way to a person's standing in the political community." (internal citation and quotation omitted)). In other words, the State

is "sending a message of approval or disapproval of individual religious choices." *Stark v. Independent Sch. Dist.*, 123 F.3d 1068, 1074 (8th Cir.1997). The primary effect of the statutory exemption is that the State, by exempting some religious individuals and not others, acts to influence the public perception of different religions and religious beliefs disparately and without neutrality, as well as to inhibit the religious beliefs and practices of those individuals who oppose immunization but are not members of a religious organization the State recognizes. The Court notes, further, that simply because the State may permissibly burden a person's exercise of his or her religion does not mean that that burden is then *de minimis* —indeed, the General Assembly's provision of a religious exemption from immunization recognizes the burden immunization may place on the religiously-opposed individual.

The Court next considers whether the statutory exemption confers a benefit on religious believers without providing a corresponding benefit to a large number of nonreligious groups or individuals. Defendant defines the benefit in question broadly as the ability or opportunity to attend school. In this sense, the statute does not confer a benefit on non-immunized, exempted individuals that is not available to immunized individuals. A benefit *is* conferred, however, on those two groups over individuals who refuse immunization on religious grounds but are not members of a religious church or denomination which the State recognizes. This case is ill-suited for the "benefit" prong of the second part of the *Lemon* test, and more properly reviewed under the *Larson* standard, because this statute distinguishes between types of religious beliefs. Determining, for example, that the statute permits non-immunized Christian Scientist children to attend school, just as immunized children of any or no faith may attend school, does not assist in determining whether the Establishment Clause is violated by excluding someone like Ashley Boone from school.

### 3. Entanglement

The Court now turns to the third part of the *Lemon* test: that the law not foster excessive government entanglement with religion. *See Lemon*, 403 U.S. at 613, 91 S.Ct. at 2111. The Supreme Court has said that a law violates the Establishment Clause when it requires a "comprehensive, discriminating, and continuing state surveillance." *Lemon*, 403 U.S. at 619, 91 S.Ct. at 2114.

On the entanglement question, defendant points the Court to a non-First Amendment, tax case wherein the Eighth Circuit accepted fourteen factual criteria, provided by the IRS, as a guide in deciding what constitutes a church. *See Spiritual Outreach Soc. v. Commissioner of IRS*, 927 F.2d 335, 338 (8th Cir.1991). In *Spiritual Outreach*, a religious organization appealed the tax court's denial of its claim for status as a church under the tax code. The Eighth Circuit, determining the organization was not a church for tax purposes and thus not entitled to preferential tax treatment, focused on the core factual requirements of the fourteen criteria: the existence of an established congregation served by an organized ministry, the provision of regular religious services and religious education for the young, and the dissemination of doctrinal code. *Id.* at 339.

Defendant argues that the Department of Health's use of similar routine and factual criteria to determine what constitutes a "recognized church" likewise is permissible. The Arkansas Department of Health's Religious Exemption Application addresses the "Definition of a 'Recognized' Church" as follows:

> Parents or guardians, to claim a religious exemption, must demonstrate that

the "religious tenets and practices" on which they base their objections to immunizations are those of a "recognized" religion. The Department will consider such evidence as a permanent address, number of members, times and places of regular meetings, existence of written constitution or plan of organization, and a written theology or statement of beliefs, and copies of legal documents filed with any local, state or national governmental agency.[21]

The Application itself asks questions such as "How many members does your church have (worldwide) (Arkansas)?" and "Where are your meetings customarily held?"[22] A parent or guardian must also submit a notarized letter from an official of the church or denomination certifying that the parent or guardian "is currently a member in good standing of the church or denomination."[23] The parent or guardian must submit "an explicit and specific statement of the church's or denomination's condemnation or disapproval of immunizations, demonstrating why immunization is not allowed or approved."[24]

The entanglement question is a difficult and close one. Defendant states that the Department of Health is ill-equipped to understand or interpret church teachings and to surmise church doctrine, and that it merely accepts or denies the exemption based upon whether the requested information is provided. Yet requiring the Department to evaluate whether the church or denomination's statement against immunization, for example, (1) is sufficiently explicit and specific, or (2) sufficiently demonstrates why immunization is not allowed

or approved, could invite excessive entanglement. The Court also notes that the Department is not simply charged with determining what constitutes a church; rather, the Department is required to determine what constitutes a "recognized" church. Regardless, in cases where courts have determined that religious exemptions do not beg excessive entanglement, an oft-mentioned factor is the exemption's neutrality. *See, e.g., Children's Healthcare,* 212 F.3d at 1090–91 (noting exemption granted upon statement that individual is conscientiously opposed to medical treatment and that such treatment is inconsistent with individual's religious beliefs); *Stark,* 123 F.3d at 1075 (noting school district avoided considering parents' religious motivations for requesting exemptions from use of technology); *Turner,* 186 F.Supp.2d at 192–93 (noting immunization exemption extended to anyone with a genuine or sincere religious belief). *See also Texas Monthly v. Bullock,* 489 U.S. 1, 20 n. 9, 109 S.Ct. 890, 902 n. 9, 103 L.Ed.2d 1 (1989); *Good News/Good Sports Club v. City of Ladue,* 28 F.3d 1501, 1510 n. 19 (8th Cir.1994). Finally, the Court notes that, in practice, there is room in the Department of Health's inquiry for state officials' personal biases about what constitutes a religion.[25] On the balance, the Court must find that the statutory exemption fosters excessive government entanglement with religion.

In conclusion, the Court finds that the immunization statute's religious exemption provision, as written and as applied, fails the *Lemon* test, and thus violates the Establishment Clause.

21. *See* docket no. 56, plaintiff exhibit B.

22. *See id.; see also id.,* exhibit A (transcript), at pages 43–45.

23. *See id.,* plaintiff exhibit B.

24. *See id.*

25. *See id.,* exhibit A (transcript), at page 43–46 (indicating coordinator of religious exemption program's belief that regular meetings alone constitute a prerequisite to recognition of a religion, and that some doctrinal questions must be referred to legal staff).

## C. Free Exercise Clause—Statutory Exemption

■ The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, *see Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof. . . .* " U.S. Const. amend. I (emphasis supplied). Plaintiff argues that the that the limitation of the statutory exemption to a "recognized church or religious denomination" violates her rights under the Free Exercise Clause and is unconstitutional.

After *Larson,* a law that on its face grants a denominational preference may be upheld only if it is supported by a compelling state interest. *Larson,* 456 U.S. at 246–47, 102 S.Ct. at 1684–85; *Hernandez v. C.I.R.,* 490 U.S. 680, 695, 109 S.Ct. 2136, 2146, 104 L.Ed.2d 766 (1989). As the Supreme Court has explained:

> The constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause. Madison once noted [in The Federalist No. 51]: "Security for civil rights must be the same as that for religious rights. It consists in the one case in the multiplicity of interests and in the other in the multiplicity of sects." Madison's vision—freedom for all religion being guaranteed by free competition between religions—naturally assumed that every denomination would be equally at liberty to exercise and propagate its beliefs. But such equality would be impossible in an atmosphere of official denominational preference. Free exercise thus can be guaranteed only when legislators—and

voters—are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations.

*Larson,* 456 U.S. at 244–45, 102 S.Ct. at 1683–84.

It is difficult to imagine how the State would have a compelling interest in limiting the religious exemption to some religious sects and individuals over others, and in its briefs, the State advances none. No doubt it may be necessary to have quick means of identifying those children who have not been immunized against a disease in the event of an outbreak;[26] however, there is no reason the State would need to notify these children through their "recognized churches" rather than through their schools; indeed, the State can identify the non-immunized children through an already-existing database.[27] Where the State elects to accommodate religion on a particular issue like immunization, it is simply not constitutionally permissible for it to indulge the free exercise rights of some individuals and inhibit the free exercise rights of others on an arbitrary basis. *See Sherr v. Northport–East Northport Union Free Sch. Dist.,* 672 F.Supp. 81, 90–91 (E.D.N.Y. 1987) ("While the state may be quite genuinely concerned with limiting the improper evasion of immunization, minimizing the total number of people exempt from the mandatory vaccination program, or devising a legally and logically coherent definition of religion, there surely exist less restrictive alternative means of achieving the state's aims than the blatantly discriminatory restriction of [the] religious exemption. . . .").

## D. Severability of Religious Exemption

■ Having determined that the statutory exemption violates the First Amend-

---

**26.** *See* docket no. 56, exhibit A (transcript), pages 137–39.

**27.** *See id.,* pages 146–47.

ment, plaintiff asks this Court to re-write the statutory exemption to "effectuate the intent of the statute."[28] This Court does not lightly declare statutes unconstitutional, and seeks to preserve the constitutionality of the law whenever possible. While it was perhaps enlightened of the General Assembly to attempt to provide a religious exemption where one was not constitutionally required, this Court is disinclined to re-write the immunization statute to fashion a broader exemption that the General Assembly may not have contemplated or intended. Rather, under Arkansas law, the proper remedy is for this Court to "sever" the religious exemption from the remainder of the statute. Specifically, Arkansas Code Annotated § 1–2–117 provides:

> Except as otherwise specifically provided in this Code, in the event any title, subtitle, chapter, subchapter, section, subsection, subdivision, paragraph, item, sentence, clause, phrase, or word of this Code is declared or adjudged to be invalid or unconstitutional, such declaration or adjudication shall not affect the remaining portions of this Code which shall remain in full force and effect as if the portion so declared or adjudged invalid or unconstitutional was not originally a part of this Code.

*See also Hutton v. Savage*, 298 Ark. 256, 769 S.W.2d 394, 399 (1989) ("[I]t is well settled that where a statute or code provision is unconstitutional in part, the valid portion of the act will be sustained if complete in itself and capable of execution in accordance with apparent legislative intent.").

In this case, that the statutory exemption has been declared unconstitutional does not dismantle the entire immunization statute. Rather, the statute's language indicates that the General Assembly sought to establish a comprehensive immunization program for school children, and the statute is complete in itself and capable of execution in accordance with that intent without the provision providing for religious exemption. Subsection (d)(2) of Arkansas Code Annotated § 6–18–702 must be stricken as unconstitutional, but the remaining portions of the statute remain in full force and effect. In other words, there now exists no statutory religious exemption to immunization in the State of Arkansas.[29]

### E. Free Exercise Clause—Compulsory Immunization

■■ Plaintiff challenges the constitutionality of compulsory immunization, as required by Arkansas Code Annotated § 6–18–702(a), under the Free Exercise Clause. The standard by which a court reviews a claim under the Free Exercise Clause depends upon the nature of the law or the precise characterization of the right at issue. "A law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice . . . .

---

**28.** In effect, plaintiff would have the Court edit the statute as follows: "The provisions of this section shall not apply if the parents or legal guardian of that child object thereto on the grounds that immunization conflicts with the religious tenets and practices of the parent or guardian."

**29.** The Court recognizes that, beyond disappointing plaintiff, this conclusion may distress those individuals who previously benefitted from the religious exemption to the immunization statute; however, recourse lies in the political process. As Judge Dawson recognized, it is certainly within the General Assembly's province to enact a new religious exemption that comes within constitutional boundaries.

a law failing to satisfy [the neutrality and general applicability] requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993). In certain cases, however, which have come to be known as "hybrid rights" cases, the Court may apply strict scrutiny to neutral laws of general applicability because a Free Exercise claim is conjoined with other constitutional protections such as freedom of speech and of the press, or the right of parents to direct the education of their children. *See Employment Div. v. Smith*, 494 U.S. 872, 881–82, 110 S.Ct. 1595, 1601–02, 108 L.Ed.2d 876 (1990). The Supreme Court has frowned upon extending strict scrutiny to compulsory immunization laws, albeit in *dictum*. *Smith*, 494 U.S. at 888–89, 110 S.Ct. at 1605–06.

▆ Plaintiff asserts strict scrutiny of the immunization statute is required because, as demonstrated by the religious exemption, is not a neutral law of general applicability. Alternately, plaintiff argues that her Free Exercise and parental rights combine to make this a "hybrid rights" case in which strict scrutiny review should apply. At the outset, the Court finds that plaintiff's Free Exercise challenge to compulsory immunization is a challenge to a neutral law of general applicability. This Court has already determined that the statutory religious exemption of Arkansas

Code Annotated § 6–18–702(d)(2) is unconstitutional, and severed it from the remainder of the immunization statute. Plaintiff cannot now rely on an invalidated statutory exemption to determine the standard of review for her general challenge to the power of the State under Arkansas Code Annotated § 6–18–702(a) to immunize religious individuals. Rather, plaintiff must direct her challenge at the remainder of the statute that is in effect.

Subsection (a) of the immunization statute does not target religious beliefs or seek to infringe upon or restrict certain practices because of their religious motivation, *see Lukumi*, 508 U.S. at 542, 113 S.Ct. at 2231; its "object" is to protect school children against the spread of disease through mandatory immunization.[30] It applies to all school children, save those for whom immunization would endanger their health.[31] *See* Ark.Code Ann. § 6–18–702(d)(1) & (3); *Jacobson v. Massachusetts*, 197 U.S. 11, 38–39, 25 S.Ct. 358, 366, 49 L.Ed. 643 (1905) ("[S]uppose the case of an adult who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular condition of his health or body would be cruel and inhuman in the last degree. We are not to be understood as holding that the [vaccination] statute was intended to be applied to such a case. . . ."). Because the immunization statute is a neutral law of general applicability, heightened scrutiny is not required even though compulsory immunization may burden plaintiff's right to free exercise.

30. The Court notes that the portion of the immunization statute challenged in this section was enacted wholly apart from the religious exemption, which was added sixteen years later. *See* 1983 Ark.Acts 150 ("An Act to Amend Section 3 of Act 244 of 1967 to Exempt from the Mandatory Pertussis Immunization Requirements for School Children, with Siblings, Either Whole Blood or Half Blood, Who Have Had Serious Adverse Reactions to Such Immunizations Which Reaction Resulted in a Total Permanent Disability; and for Other Purposes.")

31. For example, individuals who have had a life-threatening allergic reaction to baker's yeast or to a previous dose of the Hepatitis B vaccine (it is administered in three doses) are advised not to take the Hepatitis B vaccine. *See* docket no. 56, health department exhibit 5.

It is well established that the State may enact reasonable regulations to protect the public health and the public safety, and it cannot be questioned that compulsory immunization is a permissible exercise of the State's police power. *See Zucht v. King,* 260 U.S. 174, 176, 43 S.Ct. 24, 25, 67 L.Ed. 194 (1922); *Jacobson,* 197 U.S. at 24–25, 25 S.Ct. at 360–61. The Supreme Court has long recognized that a state may require public and private school children to be immunized. *See id.* The constitutionally-protected free exercise of religion does not excuse an individual from compulsory immunization; in this instance, the right to free exercise of religion and parental rights are subordinated to society's interest in protecting against the spread of disease. *See·Prince v. Massachusetts,* 321 U.S. 158, 166–67, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (The state's authority "is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion. . . ."); *Wright v. DeWitt Sch. Dist.,* 238 Ark. 906, 385 S.W.2d 644, 647–48 (1965); *Cude v. Arkansas,* 237 Ark. 927, 377 S.W.2d 816, 819–20 (1964).

Plaintiff seeks to distinguish her case from what she refers to as "this draconian vaccine jurisprudence" by asserting that those cases were decided on the basis of a declared health emergency involving smallpox, while in this case Hepatitis B presents no "clear and present danger." The Court is not persuaded by this argument. The Supreme Court did not limit its holding in *Jacobson* to diseases presenting a clear and present danger.[32] Even if such a distinction could be made, the Court cannot say that Hepatitis B presents no such clear and present danger. Hepatitis B may not be airborne like smallpox; however, this is not the only factor by which a disease could be judged dangerous. Hepatitis B is spread by bodily fluids; the virus is "fairly hearty and can survive on surfaces, door knobs, et cetera, for up to a month." [33] Hepatitis B can lead to sclerosis, scarring and fibrosis of the liver, or liver cancer after chronic infection.[34] Globally, Hepatitis B is second only to tobacco as a leading cause of cancer.[35] Approximately 1.25 million people in the United States have chronic Hepatitis B infection; each year it is estimated that 80,000 people, mostly young adults, become infected with the Hepatitis B virus.[36]

Because the groups at highest risk for Hepatitis B are unlikely to self-identify and pursue the vaccine, immunizing those individuals as children is the recommended strategy to stern the spread of Hepatitis B.[37] Immunization of school children against Hepatitis B has a real and substantial relation to the protection of the public health and the public safety. The Court therefore finds that requiring schoolchildren to be immunized against Hepatitis B is a reasonable exercise of the State's police power and is constitutionally permissible even though it affects plaintiff's religious practice.

The Court now turns to plaintiff's argument that this is a hybrid rights case requiring strict scrutiny review.[38] In

**32.** *See also* the Court's discussion of plaintiff's separate due process claim, *infra* Section III.F.

**33.** *See* docket no. 56, exhibit A (transcript), pages 133–34.

**34.** *See id.,* pages 134–35.

**35.** *See id.,* page 136.

**36.** *See id.,* health department exhibit 5.

**37.** *See id.,* page 136–37.

**38.** Although it is not dispositive, the Court notes that the Supreme Court in *Smith* included compulsory vaccination laws in its "parade of horribles" to which the compelling interest test should probably not be applied. *See Smith,* 494 U.S. at 888–89, 110

addition to her Free Exercise right, plaintiff invokes her constitutional right to direct the education of her child. A parent's constitutional right to direct the education and upbringing of her child is grounded in the Due Process Clause of the Fourteenth Amendment. *See Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997). Courts have indicated that this parental right is limited in scope, however, determining, for example, that a parent has no right to: (1) exempt her child from certain reading programs the parent finds objectionable; (2) exempt her child from a school's community-service requirement; (3) exempt her child from an assembly program that included sexually explicit topics; (4) refuse standardized testing used to determine the quality of education her home-schooled child is receiving; and (5) send her child to public school on a part-time basis in order to pick and choose which courses her child will take from the public school. *Swanson v. Guthrie Indep. Sch. Dist.,* 135 F.3d 694, 698 (10th Cir.1998) (collecting cases). In contrast, a parent does have the right to: (1) send her child to private school, whether that school is religious or secular; (2) have her child attend school in a state where the teaching of foreign languages is not prohibited; and (3) withdraw her child from public education where her religion requires it as part of a way of life. *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). The key characteristic of these cases is that they relate to educational instruction. Plaintiff's desire that her daughter not be immunized has no relation to her directing her daughter's education, other than it may limit where and how she receives that education. A parent's constitutional right to direct the education of her child is not implicated under the facts of this case, and thus plaintiff cannot proceed under a "hybrid rights" theory.

In keeping with longstanding Supreme Court precedent, the Court finds that, as it relates to compulsory immunization of school children, the statutory religious exemption having previously been stricken, Arkansas's immunization law does not violate plaintiff's Free Exercise rights and is constitutional.

### F. Substantive Due Process

 Although some aspects of plaintiff's due process argument are implicated in her First Amendment arguments, as discussed above, plaintiff has separately filed a motion for summary judgment under the Fourteenth Amendment. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV. As plaintiff points out, the right to refuse medical treatment is assumed to be a part of liberty protected under the Due Process Clause.[39] *See Cruzan v. Director,* 497 U.S. 261, 278–79, 110 S.Ct. 2841, 2851–52, 111 L.Ed.2d 224 (1990). This right is not absolute, however, and can be regulated by the State. *See, e.g., Jacobson,* 197 U.S. at 24–30, 25 S.Ct. at 360–61. "[D]etermining that a person has a 'liberty interest' under

S.Ct. at 1605–06 (citing an Arkansas Supreme Court case which upheld the State's power to require compulsory immunization of school children over religious objections, *see Cude,* 377 S.W.2d at 818–820).

**39.** "Although many state courts have held that a right to refuse treatment is encompassed by a generalized constitutional right of privacy, we have never so held. We believe this issue is more properly analyzed in terms of a Fourteenth Amendment liberty interest." *Cruzan,* 497 U.S. at 279 n. 7, 110 S.Ct. at 2851 n. 7.

the Due Process Clause does not end the inquiry; whether [an individual's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Cruzan*, 497 U.S. at 279, 110 S.Ct. at 2851–52 (internal quotation omitted). Where the State infringes on a *fundamental* constitutional right, strict scrutiny applies; otherwise, the state need only have a legitimate purpose. *Washington v. Glucksberg*, 521 U.S. 702, 728, 117 S.Ct. 2258, 2271, 138 L.Ed.2d 772 (1997). *Cruzan* does not make clear whether the right to refuse medical treatment is a fundamental right requiring proof that the state's infringement is necessary and compelling, but the Supreme Court has recently indicated that there is no fundamental right to assisted suicide. *Id.*

Plaintiff complains that "*Jacobson* and *Zucht* are utterly archaic in 14th Amendment substantive due process terms, and worthless as precedent in light of the extensive jurisprudence of the 20th Century." [40] It is the responsibility of this Court, however, until the Supreme Court says otherwise, to give effect to immunization cases like *Jacobson* and *Zucht*. *See Agostini v. Felton*, 521 U.S. 203, 207, 117 S.Ct. 1997, 2002, 138 L.Ed.2d 391 (1997) ("The Court neither acknowledges nor holds that other courts should ever conclude that its more recent cases have, by implication, overruled an earlier precedent. Rather, lower courts should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Even if this Court were to review plaintiff's argument against immunization in light of the Court's most recent substantive due process cases, plaintiff would not prevail.

To properly determine whether an asserted right is a fundamental right subject to heightened protection under the Due Process Clause, and to limit the subjectivity inherent in the analysis of a substantive due process claim, a court must: (1) consider whether the asserted right is deeply rooted in the nation's history and traditions, and implicit in the concept of ordered liberty; and (2) require a careful description of the asserted fundamental right at stake. *Glucksberg*, 521 U.S. at 720–21, 117 S.Ct. at 2267–68. The question presented in this case is not, as plaintiff suggests, simply whether a parent has a fundamental right to decide whether her child should undergo a medical procedure such as immunization. Carefully formulated, the question presented by the facts of this case is whether the special protection of the Due Process Clause includes a parent's right to refuse to have her child immunized before attending public or private school where immunization is a precondition to attending school.[41] The Nation's history, legal traditions, and practices answer with a resounding "no."

Since the early twentieth century the Supreme Court has acknowledged that a state may require school children to be immunized. *See Zucht*, 260 U.S. at 176, 43 S.Ct. at 25; *see also Jacobson* and *Prince*, *supra.* Compulsory immunization has long been practiced in Arkansas and other states. *See, e.g., Wright*, 385 S.W.2d at 647–48; *Cude*, 377 S.W.2d at 819–20 (cited in *Smith*, 494 U.S. at 888–89, 110 S.Ct. at 1605–06); *Board of Educ. v. Maas*, 56 N.J.Super. 245, 152 A.2d 394 (App.Div. 1959); *Ohio ex rel Dunham v. Board of*

---

**40.** *See* docket no. 54, page 10, footnote 17.

**41.** The Court notes that plaintiff's argument against subjecting her daughter to a medical

procedure is not based on any concern that the vaccine is specifically medically contraindicated for Ashley Boone; this would be an entirely different matter.

*Educ.*, 154 Ohio St. 469, 96 N.E.2d 413 (1951); *Mosier v. Barren County Board of Health*, 308 Ky. 829, 215 S.W.2d 967 (1948); *City of New Braunfels v. Waldschmidt*, 109 Tex. 302, 207 S.W. 303 (1918). What is "implicit in the concept of ordered liberty" is an understanding that:

> [T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members.

*Jacobson*, 197 U.S. at 26, 25 S.Ct. at 361. It is apparent from these cases, and from a century of the nation's experience, that requiring school children to be immunized rationally furthers the public health and safety. Finally, to the extent plaintiff asserts that Ashley Boone has a fundamental constitutional right to a free and appropriate public education which outweighs the State's interest in immunizing school children, plaintiff is incorrect. While the Court does not minimize the importance of education, it is firmly established that the right to an education is not provided explicit or implicit protection under the Constitution and is not a fundamental right or liberty. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973).

Plaintiff also raises the issue of informed consent. The State apparently provides informed consent forms to parents and guardians before a child is immunized;[42] plaintiff makes no allegation that she did not give, or was not provided information sufficient for, informed consent. "Informed consent" is not implicated by the facts in this case; this case is about "no consent." Plaintiff's informed consent argument is unavailing.

## IV. Conclusion

THEREFORE, plaintiff's motion for summary judgment under the Fourteenth Amendment [docket no. 53] is hereby DENIED; plaintiff's motion for summary judgment under the First Amendment [docket no. 56] is hereby GRANTED to the extent that Subsection 6–18–702(d)(2) of the Arkansas Code Annotated is stricken as violating the Establishment Clause and Free Exercise Clause of the First Amendment, and DENIED as to all other grounds.[43]

FURTHER, separate defendant Fay Boozman's motion for summary judgment [docket no. 47], in which separate defendant Cabot School District joins [docket no. 50], is hereby DENIED to the extent subsection (d)(2) is declared unconstitutional, but GRANTED to the extent that the remaining portions of the statute are found to be constitutional and valid.

FURTHER, because the preliminary injunction entered by the Court expired at the conclusion of the 2001–2002 school year, there is no need to dissolve that injunction.

Judgment shall be entered accordingly.[44]

---

**42.** *See* docket no. 56, exhibit A (transcript), pages 149–50.

**43.** In Count IV of her second amended complaint [docket no. 44], plaintiff asserts that her right to equal protection has been violated. Plaintiff does not make this a focus of her motions for summary judgment, but states in a footnote: "Clearly, a law which exempts the adherents of 'recognized' religions, yet denies exemption on the basis of personal, sincere religious belief, is predisposed to deny Equal Protection of law, as well." *See* docket no. 57, page 19, footnote 26. The Court agrees.

**44.** On the issue of attorney's fees and costs, the parties are referred to Local Rule 54.1.

## JUDGMENT

In accordance with the Memorandum Opinion and Order entered this date, this case is hereby dismissed; all relief requested by plaintiff is denied with one exception: subsection (d)(2) of Arkansas Code Annotated § 6–18–702 is stricken as unconstitutional.